## THE CHALMETTE.

### (District Court, S. D. New York. March 23, 1899.)

1. COLLISION.

At the time of a collision in the Narrows, the channel had been mined by the government, leaving an irregular passage, marked by buoys, which varied in width from 100 feet between the middle buoys to 1,100 and 1,250 feet between the upper and lower ones, respectively. Patrol boats were stationed at either end, and, on the steamer C. coming in, she was directed to go to the west side of the passage, and, on passing the middle buoys, changed her course to port until she was near the line of the west buoys, when she straightened. Tug G. with a tow, followed by the Ceres and tow, on coming down, were notified to keep to the east, and the G. signaled the C. that she would pass on the east side, which she did; but

the Ceres, without signaling, passed diagonally across the passage, so that the last scow of her tow swung close to the west buoy, and was run into by the C. *Held*, that the collision was caused by the failure of the Ceres to keep to the eastward as directed, and that the C. was not liable for the injury.

2. SAME—MANŒUVRE IN EXTREMIS.

The fact that the C. stopped her engines three minutes before the collision, and backed one minute, thereby canting her head slightly to the starboard, nearer the scow, being a manœuvre "in extremis," and in compliance with the rule requiring reversal in imminent danger, did not render her at fault.

In Admiralty.

James J. Macklin, for libelants.
Maxwell Evarts, for defendant the Chalmette.
Cowen, Wing, Putnam & Burlingham, for defendant the Ceres.

BROWN, District Judge. At about 6 a. m. of May 13, 1898, the libelants' Scow No. 10 being the aft boat of a tandem tow of four mud scows that were going out to sea, towed by the tug Ceres, was capsized by a collision with the steamship Chalmette, coming in from sea, in the Narrows, about opposite Ft. Lafayette. The above libel was filed against the Chalmette to recover the damages, and the Ceres was brought in by petition under the fifty-ninth rule as an additional defendant.

At the place of collision, the ordinary channel was largely obstructed by submarine mines that had been placed on each side not long before, under the orders of the war department, for the defense of the harbor during the war with Spain. The mines extended from a point a little above Ft. Lafayette to three-fourths of a mile below it. The boundaries of the passageway left open for vessels in the center of the channel, were quite irregular, and were marked on each side by three mine buoys painted white; namely, on the east by three nun buoys, and on the west by three can buoys. The two upper buoys were 1,100 feet apart, across the channel; the two middle ones opposite each other were 450 feet apart, and the two southerly buoys 1,250 feet apart. On the easterly side the middle buoy was 2,900 feet below the upper one; on the westerly side the middle buoy was 2,700 feet south of the northwesterly buoy. The collision was 200 or 300 feet south of the northwesterly can buoy, and the Chalmette a few moments before collision was pointing nearly for that buoy and about north and having the westerly middle buoy half a point or more on her starboard quarter. Between the two middle buoys there was a clear passageway of only 100 feet in width, the rest of the space on each side being occupied with mines. A government patrol boat was stationed at this point, as well as at the upper buoys, to direct vessels coming either way as to the proper course to avoid the mines.

On the morning of the collision, the Chalmette was met by the patrol boat at the lower buoys, and her course was directed to be held through the narrow passage of the middle buoys, and thence to the westward. While she was coming up, the Ceres with her tow, and 4 other tugs with tows in the immediate vicinity, were coming

down with a strong ebb tide. The tug Governor with her tow, a quarter of a mile or more ahead of the Ceres, gave a signal of two whistles to the Chalmette in accordance with previous directions from the patrol above to keep to the left. This signal was answered by two whistles from the Chalmette when the latter was in the passage between the middle buoys. The Chalmette hard a-starboarded before she was completely through the narrow passage and kept to the westward until she was about on a line with the westerly buoys, when she straightened up, heading about north for the upper buoy, so that her stern was to the westward of the line of the buoys and the westerly middle buoy a little on her starboard quarter. When nearly up to the westerly buoy as above stated, she struck the starboard quarter of Scow No. 10, which as her witnesses testify, was at that time heading two or three points across the channel to the eastward. No whistles were exchanged between the Chalmette and the Ceres. Braine, a witness from the northerly patrol boat, testifies that the Ceres was notified some time before collision to keep on the east side of the passage, and that she had previously been warned that her practice in coming down on the ebb tide was to go too far to the westward, which, on turning to the southward, caused her tow to swing too much towards the westerly side of the passage way; and he says at this time she did the same, going to the southwestward and then swinging round. The pilot of the Ceres denies that such was his course, or that any such instructions were given him; and he says that on previous days he had been ordered to go to the westerly side of the channel, and not to the easterly side. He and his mate testify also that they had come down in a nearly straight course, near the middle of the passage, heading about S. $\frac{1}{2}$ E. with the tow nearly straight behind, and that the collision was caused by the reversal of the Chalmette's engines, which made her head swing to starboard while running at considerable speed, and that otherwise she would have passed clear; and that the Ceres which was on a hawser about 500 feet ahead of No. 10 had passed the Chalmette about 150 feet to the eastward of her.

The testimony of most of the important witnesses presents some very gross inconsistencies in detail, and some impossibilities. It is needless to attempt to deal with them seriatim. It is evident that the account of the pilot and mate of the Ceres as to their course cannot be correct. From the time the Governor and Chalmette exchanged signals of two whistles, which were observed by the pilot of the Ceres, the latter knew perfectly well that the steamer and his tug and tow must pass each other by going to the left, even if he had not received any warning from the patrol to keep to the easterly side. The pilot saw the sheer of the Chalmette to the westward in accordance with the signals; and he gave no signal of his own, as he certainly would have done, if he had expected to pass on the westward side. After the previous signals and the evident sheer of the Chalmette much to the westward, there was no further necessity for signals between the Chalmette and the Ceres; and their conduct shows that the previous signals were adopted as sufficient for them both. There was about 900 feet breadth of water in the passage way

at the place where this collision occurred, which was abundant for these vessels to pass each other safely.

The weight of evidence, as I have already said, is that the Chalmette at the time of collision was well over to the westward, upon the line of the westerly buoys, leaving nearly the entire breadth of the channel for the use of the Ceres and her tow. Braine, on the Dalzelle, near the northeast buoy, was watching the Ceres at the time of the collision and is the best disinterested witness of the occurrence. He thrice states, as the officers of the Chalmette also say, that the collision was close over to the west line of the buoys,— "right up against the can (west) buoy." The Chalmette "struck the can buoy" (after collision). "She was crowded onto the can buoy." The Ceres, 500 feet ahead of No. 10 and heading to the S. E., was then probably at least one-third the way across. What Braine says, however, as to intervals of time and the position of the Ceres before entering the passage has some manifest absurdities, which arise perhaps from his confounding the Ceres with the Luckenback, which was one-fourth of a mile astern and to the eastward of the Ceres. But this does not affect his observation of the collision itself. The important point is, where at that time was No. 10, 500 feet astern of the Ceres. On this point, Quinn's testimony is much inferior; he was half a mile below; the upper buoy was "hid from his view by the stern of the steamer"; and his incorrectness as to the Ceres is manifest from his statement that she was heading about S. by E. and her tow straight behind her, which if true, would have made collision impossible. No. 10, the rear boat of the tow, the master of the Chalmette says went close to the buoy. Quinn's location of the collision by the models shows it was on the west line of the channel, although the heading he gives to the Chalmette is manifestly too much to the eastward, and that of the Ceres too little. He estimates the swing of the Chalmette to starboard through reversing, to be only one or two points, while the master thinks her swing was little, if any, and not at most over one-half a point; and the heading of the Chalmette before reversal was about north, as stated by both masters.

The log of the steamer and her testimony show that her engine was reversing one minute before collision; and as she came up at only about four or five knots speed by land, and even that speed had been checked by two or three minutes' stop of her engines, she must have been moving at the time of collision very slowly, and was probably nearly still by land. As the Ceres passed about 150 feet to the eastward of the Chalmette when the latter reversed, it is certain that if the tow had been coming nearly straight down and directly behind her, as her pilot and Quinn testify, the libelants' scow, though about 500 feet astern of the Ceres, could not have been struck by the Chalmette merely through her swing of a point to starboard. The Ceres was going down at the rate of a little over two knots in addition to the tide, so that the interval between the collision and the time when the Ceres was abreast of the Chalmette (when the Chalmette reversed) could not have much exceeded a minute.

I have no doubt, therefore, that the collision was caused by the

fact that the tow was not going down on the line of mid channel, viz. about S. ½ E., nor near mid channel, but was crossing the bow of the Chalmette near the westerly limit of the channel, somewhat crescent shaped, and sagged down upon her; and as the Chalmette was nearly in the line of the westerly buoys, it is clear that the Ceres had previously gone much too far to the westward, as Braine testifies, and that she was no where near the center of the channel way. As there was plenty of space to the eastward, the Ceres was wholly responsible for this false position of the tow. At the signal of two whistles the Ceres and the Chalmette were about two-thirds of a statute mile apart, and there was an interval of five or six minutes before collision. Had the Ceres, moving at least at the rate of 2 knots through the water, pulled to the southeast for half this interval, which there was nothing to prevent, her tow would have been 200 feet further to the eastward, nearer where she should have been and out of harm's way. The Ceres, therefore, has no excuse for being where she was. Contrary to her own pilot's statement, some witnesses say she was crossing the channel at an angle of 45°, heading S. E., and was doing all she could to keep away; but it is plain that this could only have been true at the last moment and too late to be effectual. It is what the Ceres ought to have done much earlier, but did not do. The tide, through the Narrows, moreover, is about true, and did not present, as suggested, any material hindrance to a straight course down the center or east side of the passage.

I do not think any fault is established in the Chalmette. When she passed the middle buoys, the three tows behind the Governor were at different distances,—the nearest two-thirds of a mile away, —and they did not interfere with any necessary manœuvres of each other. There was room for all. The Chalmette's speed was very moderate. Being on the extreme westerly line of the passageway she had a right to expect that the Ceres would seasonably haul her tow sufficiently to the eastward, as she might easily have done, and which she began to do too late. The Chalmette stopped her engines about three minutes before collision, and backed one minute when reversal seemed necessary. The libelants and the Ceres contend that this reversal was a fault, and brought about the collision by canting the steamer's head to starboard. But as I have said, any starboard swing must have been small in so slight a change as about one point. But even if the scow might have barely escaped had the steamer not reversed, reversal under the circumstances cannot be considered a legal fault in the Chalmette. Reversal, in the apparent danger, was justified by the rule. The master was not bound to take the responsibility of departing from the rule, and he was in no way responsible for the false position of the scow. He had come up with entire prudence and caution and rightly delayed backing until backing seemed necessary, because he was apprehensive of the mines to the westward of the line of the buoys, which would prevent backing far. He acted according to his best judgment under peculiar circumstances, backing when collision seemed imminent; and this manœuvre so near collision, was a manœuvre in extremis, in the exercise of his best judgment; or, at least, any fault of the

Chalmette is so doubtful that according to the doctrine of The City of New York, 147 U. S. 72, 85, 13 Sup. Ct. 211, she cannot properly be held responsible.

Decree for damages against the Ceres only, with costs; as against the Chalmette, the libel is dismissed with costs.

------

## THE MARS.

### (District Court, E. D. New York. April 15, 1899.)

COLLISION—TUG AND BARGE IN TOW—FOLLOWING VESSEL.

> A tug which was following another tug with two barges in tow on a parallel course, and about abreast of the tows, slowed and sheered to the starboard, and, in attempting to pass under the stern of the last barge to a position on the other side, came into collision with the barge and injured her. *Held*, that the tug, being the burdened vessel, under duty to keep out of the way, was presumptively in fault: and a claim that the barge, which carried some sail, sheered suddenly from her course, causing the collision, must be well supported by evidence to exonerate the tug.

This was a libel in rem against the steam tug Mars to recover damages for collision.

Owen & Sturges and Edward L. Owen, for claimants.

Peter S. Carter, for libelants.